Jeffrey M. Goldman, Esq. (State Bar No. 233840)
  goldmanj@pepperlaw.com
**PEPPER HAMILTON LLP**
4 Park Plaza, Suite 1200
Irvine, California  92614
Tel:  949.567.3500; Fax:  949.863.0151

Angelo A. Stio III, Esq. (*pro hac vice* to be filed)
  stioa@pepperlaw.com
T. Stephen Jenkins, Esq. (*pro hac vice* to be filed)
  jenkinst@pepperlaw.com
**PEPPER HAMILTON LLP**
Suite 400
301 Carnegie Center
Princeton, NJ  08543-5276
Tel:  609.951.4125; Fax:  609.452.1147

*Attorneys for Plaintiff*
*Fund Recovery Services, LLC*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| FUND RECOVERY SERVICES LLC, | Electronically Filed |
| Plaintiff, | Case No.  _____ |
| v. | Honorable _____ |
| SHORESIDE SPV FUNDING I, LLC; SHORESIDE LOANS, LLC; DYLAN C. COHEN; RICHARD COHEN; NANCY COHEN; KATHY COHEN; SHORESIDE SPV FUNDING II, LLC; SHORESIDE CAPITAL, LLC; FPH CAPITAL PARTNERS, NAVIN NARANG, BRAD BARLOW, JOHN or JANE DOES, 1 through 10, and ABC CORPORATIONS, 1 through 10, | Crtrm.: _____ |
| | **VERIFIED COMPLAINT** |
| Defendants. | |

-1-
Verified Complaint

Plaintiff Fund Recovery Services LLC, by and through its attorneys Pepper Hamilton LLP, and for its Verified Complaint against defendants Shoreside SPV Funding I, LLC; Shoreside Loans, LLC; Shoreside Capital, LLC; Shoreside SPV Funding II, LLC; Dylan C. Cohen; Richard Cohen; Nancy Cohen; Kathy Cohen; FPH Capital Partners; Navin Narang; Brad Barlow; John and Jane Does 1 through 10; and ABC Corporations 1 through 10 (collectively, "Defendants") states as follows:

## JUSISDICTION

1.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A. §1332(a)(1) because the action involves a dispute between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## PARTIES

2.     Plaintiff Fund Recovery Services LLC ("FRS") is a Delaware limited liability company with its principal place of business located in Princeton, New Jersey.  FRS is an entity that pursues recovery for defaulted loans it acquires.  By way of assignment, Princeton Alternative Income Fund, LP ("PAIF") assigned all its rights and interests to FRS in certain loans and loan documents that were entered into with defendants Shoreside SPV Funding I, LLC and Shoreside Loans, LLC.  A true and accurate copy of the Assignment is attached as Exhibit A.

3.     The loan documents assigned from PAIF to FRS include, but are not limited to:

   a) A March 27, 2015 Loan and Security Agreement entered into between PAIF and Shoreside I;

   b) A March 27, 2015 Revolving Loan Note that Shoreside I executed and delivered to PAIF;

   c) A November 10, 2015 Revised Revolving Loan Note that Shoreside I executed and delivered to PAIF;

d) A March 23, 2015 Guaranty and Suretyship Agreement that Shoreside Loans in favor of PAIF;

e) A May 4, 2016 UCC Financing Statement # 16-7523643794;

f) A May 4, 2016, UCC Financing Statements #16-7523643673 (amended May 19, 2016);

g) A May 4, 2016 UCC Financing Statements # 16-7523644189;

h) A May 19, 2016 UCC Financing Statement Amendment amending #16-7523643673;

i) A March 30, 2015 Addendum to the Loan Agreement;

j) A June 15, 2015 Addendum to the Loan Agreement;

k) A July 22, 2015 Addendum to the Loan Agreement;

l) An August 26, 2015 Addendum to the Loan Agreement; and

m) A November 10, 2015 Addendum to the Loan Agreement.

4.     Defendant Shoreside SPV Funding I, LLC ("Shoreside I") is a California limited liability company with an address of 3807 Grand View Blvd., Los Angeles, CA 90066.  Shoreside I is in the business of providing short term consumer installment loans to individuals with short term financial needs.

5.     Defendant Shoreside Loans, LLC ("Shoreside Loans") (Shoreside I and Shoreside Loans are collectively the "Old Shoreside Defendants") is a California limited liability company with an address of 3807 Grand View Blvd., Los Angeles, CA 90066.  Shoreside Loans is the parent corporation of Shoreside I and also is in the business of providing consumer installment loans as well as short term business loans.  In addition, Shoreside Loans agreed to serve as "servicer" of loans originated by Shoreside I.

6.     Defendant Dylan C. Cohen ("D. Cohen") is an individual who, upon information and belief, lives and resides in the State of California, Los Angeles County.  D. Cohen maintains an office at 3807 Grand View Blvd., Los Angeles,

Verified Complaint

CA 90066.  Upon information and belief, D. Cohen is a founder and Managing Member of Shoreside I and Shoreside Loans.

7.    Defendant Richard Cohen ("R. Cohen") is an individual who, upon information and belief, lives and resides in the State of California, Los Angeles County.  Upon information and belief, R. Cohen works for Shoreside I and Shoreside Loans and maintains an office at 3807 Grand View Blvd., Los Angeles, CA 90066.

8.    Defendant Nancy Cohen ("N. Cohen") is an individual who, upon information and belief, lives and resides in the State of California, Los Angeles County.  Upon information and belief, N. Cohen purports to be an employee of Shoreside I and Shoreside Loans.

9.    Defendant Kathy Cohen ("K. Cohen") (D. Cohen, R. Cohen, N. Cohen and K. Cohen are collectively the "Cohens") is an individual who, upon information and belief, lives and resides in the State of California, Los Angeles County.  Upon information and belief, K. Cohen purports to be an employee of Shoreside I and Shoreside Loans.

10.   Defendant Shoreside SPV Funding II, LLC ("Shoreside II") is a California limited liability company with an address of 15271 Barranca Parkway, Irvine, CA 92618.  Upon information and belief Shoreside II was formed in March 2016 for the purpose of carrying on Shoreside I's business and to enable the Old Shoreside Defendants to circumvent obligations they owed to PAIF.

11.   Defendant Shoreside Capital, LLC ("Shoreside Capital") (Shoreside Capital and Shoreside II are collectively the "New Shoreside Defendants") is a California limited liability company with an address of 5757 W Century Blvd. Ste. 500, Los Angeles, CA 90045.  Upon information and belief, Shoreside Capital was formed in March 2016 for the purpose of carrying on the business of Shoreside Loans and to enable the Old Shoreside Defendants to circumvent obligations they owed to PAIF.

Verified Complaint

12.     Defendant FPH Capital Partners LLC ("FPH") has a principal place of business located at 15271 Barranca Parkway, Irvine, CA 92618.  Upon information and belief, FPH is a co-founder of the New Shoreside Defendants and conspired with the Old Shoreside Defendants and the Cohens to form the New Shoreside Defendants in order to assist the Old Shoreside Defendants in circumventing obligations they owed to PAIF.

13.     Defendant Navin Narang is an individual who, upon information and belief, lives and resides in the State of California, Los Angeles County.  Upon information and belief, Mr. Narang, conspired with the Old Shoreside Defendants and the Cohens to form the New Shoreside Defendants in order to assist the Old Shoreside Defendants in circumventing obligations they owed to PAIF.

14.     Defendant Brad Barlow (the Cohens, Narang and Barlow are together the "Individual Defendants") is an individual who, upon information and belief, lives and resides in the State of California, Los Angeles County.  Upon information and belief, Mr. Barlow, conspired with the Old Shoreside Defendants and the Cohens to form the New Shoreside Defendants in order to assist the Old Shoreside Defendants in circumventing obligations they owed to PAIF.

15.     Defendants ABC Corporations 1 through 10 are unknown corporations and/or law firms who PAIF may have claims or causes of action similar to the claims and causes of actions against the other named defendants herein.  PAIF reserves the right to amend the complaint to name such persons with specificity if and when their identities become known.

16.     Defendants John or Jane Does 1 through 10 are unknown persons who PAIF may have claims or causes of action similar to the claims and causes of actions against the other named defendants herein.  PAIF reserves the right to amend the complaint to name such persons with specificity if and when their identities become known.

Verified Complaint

1

## **VENUE**

2    17.    Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391(a)

3  because it is the judicial district where a substantial part of the relevant events

4  giving rise to the claims occurred, it is the judicial district where PAIF sustained

5  damage as a result of the torts committed by Defendants, and it is the judicial

6  district where all Defendants are subject to the personal jurisdiction of the Court.

7    18.    The Court has personal jurisdiction over Shoreside I, Shoreside Loans,

8  Shoreside II and Shoreside Capital because these defendants have their principal

9  place of business in the State of California and conduct systematic and continuous

10  business operations within the State of California.

11    19.    The Court has personal jurisdiction over D. Cohen, R. Cohen, N.

12  Cohen, K. Cohen, Narang and Barlow because these individuals own property

13  and/or reside in the State of California and have systematic and continuous contact

14  with the State of California.

15    20.    The Court has personal jurisdiction over FPH Capital Partners because

16  this defendant has its principal place of business in the State of California and it

17  conducts systematic and continuous business operations within the State of

18  California.

19    21.    The Court has personal jurisdiction over John and Jane Does 1 through

20  10 because, on information and belief, these individuals own property and reside in

21  the State of California and have systematic and continuous contact with the State of

22  California.

23    22.    The Court has personal jurisdiction over ABC Corporations 1 through

24  10 because, on information and belief, each defendant has its principal place of

25  business in the State of California and it conducts systematic and continuous

26  business operations within the State of California.

27

28

## THE LOAN AND SECURITY AGREEMENT

23.    On March 27, 2015, PAIF and Shoreside I entered into a Loan and Security Agreement (the "Loan Agreement") that outlines the specific terms and conditions under which PAIF would make available to Shoreside I a revolving loan credit facility to be used in Shoreside I's loan operations.  A true and correct copy of the Loan Agreement is attached as Exhibit B.

24.    Section 2 of the Loan Agreement outlined the credit facility to be provided.  It recognized that during the term of the Agreement, PAIF may make revolving loans to Shoreside I up to an amount equal to the lesser of an agreed upon Borrowing Base or the Maximum Credit, which was set at two hundred fifty thousand and xx/100 dollars ($250,000.00).

25.    The Borrowing Base was equal to one hundred percent (100%) of Shoreside I's Eligible Receivables, which are defined as:

> 1.21    "**Eligible Receivables**" shall mean Receivables created by [Shoreside I] which are and continue to be acceptable to Lender based on the criteria set forth below. In general, Receivables shall be Eligible Receivables if:
>
> (a)    such Receivables arise from consumer loans originated by either (i) [Shoreside I]  or (ii) Shoreside Loans, LLC, a California limited liability company ("**Parent**") and assigned to [Shoreside I]  by Parent by an executed Assignment (as such term is defined in Section 1.15(c) of this Agreement), in each case in the ordinary course of business in compliance with the Credit and Collection Policies of [Shoreside I]  which were approved by [PAIF] and for which Microbilt acted as the primary underwriter;
>
> (b)    such Receivables arise from "consumer loans," as such terms is defined under the California Finance Lenders Law, as amended (the "CFL Law"), (i) for which Borrower has given the consumer borrower all required federal disclosures under the Truth in Lending Act of 1968,  as  amended,  and  regulations  promulgated

thereunder, (ii) that are exempt from interest rate limitations under the CFL Law, and (iii) that have a term of not more than twenty-four (24) months;

(c)   such Receivables arise under Contracts that comply with all of the representations and warranties contained in Section 8.18 of this Agreement;

(d)   such Receivables are not more than thirty (30) days past due;

(e)   such Receivables have not had more than two missed payments that remain outstanding and uncured;

(f)   the Account Party with respect to such Receivables made the first payment thereon when due;

(g)   the consumer loans giving rise to such Receivables have not been outstanding for more than twenty-four (24) months;

(h)   the Account Party with respect to such Receivables resides in one of the Eligible States;

(i)   the Account Party with respect to such Receivables has not asserted a counterclaim, defense or dispute and does not have, and does not engage in transactions which may give rise to any right of setoff or recoupment against such Receivables;

(j)   there are no facts, events or occurrences which would impair the validity, enforceability or collectability of such Receivables or reduce the amount payable or delay payment thereunder; payment thereunder;

(k)   such Receivables are subject to the first priority, valid and perfected security interest of Lender;

(l)   the Account Party with respect to such Receivables is not an officer, employee, agent or other Affiliate of Borrower;

(m)   there are no proceedings or actions which are threatened or pending against the Account Parties with

respect to such Receivables which might result in any Material Adverse Change in any such Account Party's financial condition (including, without limitation, any bankruptcy, dissolution, liquidation, reorganization or similar proceeding);

(n)   such Receivables of a single Account Party or its affiliates do not constitute more than one (1%) percent of all otherwise Eligible Receivables (but the portion of the Receivables not in excess of such percentage may be deemed Eligible Receivables), however this shall be waived for the first thirty days of the Agreement;

(o)  such Receivables are owed by Account Parties whose total indebtedness to Borrower does not exceed the credit limit with respect to such Account Parties as determined by Borrower from time to time in the ordinary course of business consistent with its current practices as of the date hereof and as is reasonably acceptable to Lender (but the portion of the Receivables not in excess of such credit limit may be deemed Eligible Receivables);

(p)  such Receivables do not arise out of or relate to "pay day loans"' or any single payment consumer product; and

(q)   such Receivables are owed by Account Parties deemed creditworthy at all times by Lender in good faith.

The criteria for Eligible Receivables set forth above may only be changed and any new criteria for Eligible Receivables may only be established by Lender in good faith based on either: (i) an event, condition or other circumstance arising after the date hereof, or (ii) an event, condition or other circumstance existing on the date hereof to the extent Lender has no written notice thereof from Borrower prior to the date hereof, in either case under clause (i) or (ii) which adversely affects or could reasonably be expected to adversely affect the Receivables in the good faith determination of Lender. Any Receivables which are not Eligible Receivables shall nevertheless be part of the Collateral.

Verified Complaint

26. Section 2.2 of the Loan Agreement requires Shoreside I to prepare, by the fifth day of each month, a certificate detailing the Borrowing Base and comparing it to the amount Borrowed.

27. Section 2.2 further recognizes that if the amount Borrowed exceeds the Borrowing Base (the "Deficiency"), the Borrower shall immediately remit amounts needed to remove the Deficiency.

28. Pursuant to Section 5 of the Loan Agreement, Shoreside I granted PAIF as security interest in all of Shoreside I's personal and real property (the "Loan Agreement Collateral").

29. Under Section 5.1, the Loan Agreement Collateral is defined as: "personal and real property . . . including without limitation . . . all Assignments . . . ; all Receivables and all Collections; all instruments . . . all Accounts . . . ; all Contract Files . . . ; all Pledged Accounts . . . ; all general intangibles . . . including . . . Intellectual Property; all goods, including . . . all Inventory and Equipment; all chattel paper . . . ; all documents; all letters of credit . . . ; all supporting obligations . . . in respect to Receivables . . . ; all investment property . . . ; all commercial tort claims . . . ; all Records; and all insurance proceeds and all claims against third parties for loss to or destruction [of the Loan Agreement Collateral]."

30. In addition to the Loan Agreement Collateral, under Section 6.1 of the Loan Agreement, Shoreside I was required to establish, maintain and provide PAIF access to two bank accounts (collectively the "Pledged Accounts").

31. The parties' agreed that the funds on deposit in the first bank account, the "Princeton Alternative Income Fund, LP – Shoreside SPV Funding I Collection Account" (the "Collection Account"), were to be used to pay PAIF outstanding principal and interest on a weekly basis.

32. The purpose of the second bank account named "Princeton Alternative Income Fund, LP – Shoreside SPV Funding I Loan Loss Reserve Account" (the "Loss Reserve Account") was to compensate PAIF "to the extent that funds

Verified Complaint

1   disbursed from the Collection Account . . . were not sufficient to pay the principal,
2   interest or any other amount then due and payable on the [loan]."

3        33.    Following a Default or Event of Default, as those terms are defined in
4   the Loan Agreement, PAIF would take over exclusive control of the Pledged
5   Accounts, which is defined as the Collection Account, the Loan Loss Reserve
6   Account and any other deposit account that is subject to a Deposit Control
7   Agreement.

8        34.    In addition to the Loan Agreement Collateral and Pledged Accounts,
9   Shoreside I agreed to certain terms in the Loan Agreement that protected the Loan
10  Agreement Collateral.

11       35.    Section 6.2 (b) of the Loan Agreement recognizes that Shoreside I and
12  its shareholders, directors, employees, agents, or Affiliates are acting as trustees for
13  PAIF and shall receive, as property of PAIF, any cash, checks, money orders, or
14  any other payment relating to and/or proceeds of Receivables, Collections, or other
15  Loan Agreement Collateral that comes into their possession or under their control
16  and immediately deposition or cause the same to be deposited in the Collection
17  Account.

18       36.    Section 6.2 (b) further recognized that Shoreside I was prohibited from
19  commingling PAIF's funds with its own funds.

20       37.    Section 6.7 of the Loan Agreement limited the use of proceeds from
21  loans that PAIF made to Shoreside I to the origination of new loans, the acquisition
22  of loans, and for general operating expenses, working capital and other proper
23  corporate purposes.

24       38.    Section 7.5 of the Loan Agreement grants PAIF access to Shoreside I's
25  premises during normal business hours and after notice, or at any time and without
26  notice to Shoreside I if an Event of Default occurs, in order to inspect, verify, and
27  audit the Collateral and all of Shoreside I's books and records.

28

Verified Complaint

39.     Section 8.12 of the Loan Agreement required Shoreside I to remain "Solvent" so that the Loan Agreement Collateral would at all times have value.

40.     Solvent is defined in the Loan Agreement, to mean, that Shoreside I "(a) is able to pay its debts as they mature and has . . . sufficient capital  . . . to carry on its business consistent with its practices as of the date hereof, and . . . (b) the assets and properties of [Shoreside I] . . . are greater than [its] Indebtedness."

41.     Section 8.16 of the Loan Agreement outlined the vendors that Shoreside I agreed to utilize in its operations.

42.     Section 9.17 of the Loan Agreement prohibits Shoreside I from changing vendors without the prior written consent of PAIF.

43.     Section 9.1(a) of the Loan Agreement required Shoreside I to preserve, renew, and keep in full force and effect Shoreside I.

44.     Section 9.1 (b) and Section 9.2 of the Loan Agreement placed certain restrictions on the ability of Shoreside I to change its name or move the location of the Collateral.

45.     Section 9.7 of the Loan Agreement prohibited Shoreside I from directly or indirectly merging into or consolidating with any other Person.  Section 9.7 also prohibited Shoreside I from selling, assigning, leasing, transferring or disposing of any of its assets.

46.     Under Section 9.12 of the Loan Agreement, Shoreside I agreed that it would only engage in fair and reasonable arm's length transactions, and would only provide its employees, consultants, officers, shareholders, directors and affiliates reasonable compensation for services rendered.

47.     Pursuant to Section 9.18 of the Loan Agreement, PAIF is entitled to recover all costs it incurs due to an Event of Default by Shoreside I.

48.     Specifically, Section 9.18 requires that "[Shoreside I] pay to [PAIF] on demand all costs, expenses (including reasonable attorney's fees), filing fees and taxes paid or payable in connection with the administration, collection, liquidation,

-12-

Verified Complaint

enforcement and defense of the [Revolving Loan Note], [PAIF's] rights in the Collateral, [the Loan Agreement], . . . [as well as] costs and expenses in preserving and protecting the Collateral [and] costs and expenses paid or incurred in connection with obtaining payment of the [Revolving Loan Note], enforcing the security interests and liens of [PAIF], [or] selling or otherwise realizing upon the Collateral."

49. Section 10.1 of the Loan Agreement set forth a list of events that constitute "Events of Default."

50. The Events of Default include, but are not limited to Shoreside I: failing to make a payment within ten (10) days after the due date of any payment obligation; becoming insolvent; making an assignment for the benefit of creditors; sending notice of a bulk transfer; calling a meeting of its creditors; terminating or replacing any of its Program Vendors without PAIF's approval; or making a Material Adverse Change.

51. Pursuant to the Loan Agreement, a "Material Adverse Change" is defined as:

> [A]s determined by [PAIF] at any time, with respect to any Person, any event, condition, obligation, liability or circumstance . . . or any change(s), including without limitation, changes in applicable laws or a regulatory action, which: (a) has any material adverse effect upon or change in the validity or enforceability of this Agreement or any of the other Financing Agreements; (b) is material and adverse to the value of the Receivables or to the business, operations, properties, assets, liabilities, prospects, or financial condition of any such Person (as applicable); (c) results in the origination, purchase or collection of the Receivables being in violation of applicable laws; or (d) materially impairs the ability of any counterparty to this Agreement or any of the other Financing Agreements to perform its obligations hereunder or thereunder or to consummate the transaction under this Agreement or any of the other Financing Agreements. Without limiting the generality or

applicability of the foregoing, a Material Adverse Change includes any material deviation from the aggregate concentrations or underwriting estimates provided by [Shoreside I] to [PAIF].

52.     Section 11.1(a) also provides that the "validity, interpretation and enforcement of [the Loan Agreement] and the other Financing Agreements and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New Jersey but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New Jersey."

## THE REVOLVING LOAN NOTE

53.     Simultaneously with the execution of the Loan Agreement, on March 27, 2015, Shoreside I executed and delivered to PAIF a Revolving Loan Note.  A true and correct copy of the March 27, 2015, Revolving Loan Note is attached as Exhibit C.

54.     Pursuant to the terms of the March 27, 2015 Revolving Loan Note, Shoreside I "unconditionally promise[d] to pay to the order of [PAIF] the principal sum of TWO HUNDRED AND FIFTY THOUSAND AND 00/100 DOLLARS ($250,000.00), or such lesser or greater principal amount as may be outstanding from time to time."

55.     In the Revolving Loan Note, Shoreside I also agreed to pay interest at the rate of twenty-four percent (24%) to PAIF on the last day of each month, as well as pay principal and interest "ON DEMAND."

56.     Pursuant to the Revolving Loan Note, upon an Event of Default in the Loan Agreement or on demand by PAIF, "(i) all amounts due under Revolving Loan Note . . . shall become immediately due and payable . . . without any demand or notice whatsoever"; and (ii) PAIF may immediately and without demand

Verified Complaint

1   exercise any of its rights and remedies granted under the Loan Agreement, other

2   Financing Agreements, under applicable law, or which it may otherwise have,

3   against [Shoreside I] or otherwise."  See Revolving Loan Note at p. 2.

4       57.    On November 10, 2015, Shoreside I and PAIF entered into a Revised

5   Revolving Loan Note ("Revised Revolving Loan Note") whereunder Shoreside I

6   "unconditionally promise[d] to pay to the order of [PAIF] the principal sum of

7   SEVEN MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS

8   ($7,500,000.00), or such lesser or greater principal amount as may be outstanding

9   from time to time."  A true and correct copy of the November 10, 2015, Revolving

10  Loan Note is attached as Exhibit D.

11      58.    The Revised Revolving Loan Note contained the same material terms

12  as the Revolving Loan Note.

13                    **THE GUARANTY AND SURETY AGREEMENT**

14      59.    On March 23, 2015, as an inducement to PAIF loaning Shoreside I

15  $250,000,  Shoreside Loans executed a Guaranty and Suretyship Agreement (the

16  "Guaranty Agreement"), in favor of PAIF.  A true and correct copy of the Guaranty

17  Agreement is attached as Exhibit E.

18      60.    Under the Guaranty Agreement, Shoreside Loans unconditionally and

19  irrevocably guaranteed to become "surety as though it were a primary obligor for,

20  the full, prompt and unconditional payment each and every "Liability of the

21  Borrower" . . . to owing to PAIF.

22      61.    The Guaranty Agreement defines "Liability of the Borrower" as

23  including "all obligations and liabilities of [Shoreside I] owed to PAIF in

24  connection with the Loan Facility.

25      62.    In Paragraph 2 of the Guaranty Agreement, Shoreside Loans agreed to

26  grant PAIF "a security interest in all consumer loans and related contracts, contract

27  files, accounts, receivables and other rights that [Shoreside Loans] may from time

28  to time assign and transfer to [Shoreside I]  . . .  and hereby authorizes [PAIF] to

-15-

Verified Complaint

file UCC financing statements against [Shoreside Loans]" (the "Guaranty Collateral").

63.     Paragraph 16 of the Guaranty Agreement provides that "[u]pon the occurrence and during the continuance of an "Event of Default" (as such term is defined in the [Loan Agreement]), [PAIF] shall be immediately entitled, [among other things,] to enforce the obligations of [Shoreside Loans]."

64.     Paragraph 20 of the Guaranty Agreement provides that Shoreside Loans "shall continue to remain in and operate substantially the same line of business presently engaged in by the Guarantor" and "shall not sell, transfer, or otherwise dispose of all or substantially all of the Guarantor's properties and assets."

65.     Paragraph 31 of the Guaranty Agreement provides that "[i]n case of any proceedings to collect any liabilities of [Shoreside Loans] owed to the [PAIF] hereunder, [Shoreside Loans] shall pay all reasonable costs and expenses of every kind for collection, sale or delivery of any collateral or assets or properties of [Shoreside Loans], including reasonable attorneys' fees."

66.     Paragraph 35 of the Guaranty Agreement provides that the "validity, interpretation and enforcement of this Agreement and the other Financing Agreements and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New Jersey but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New Jersey."

## ADDENDUMS TO THE AGREEMENTS

67.     After executing the Loan Agreement and Guaranty Agreement, PAIF, Shoreside I and Shoreside Loans entered into five addendums to the agreements.

68.     Each addendum increased the maximum credit under the Loan Agreement and was evidenced by a Revised Revolving Loan Note.

69.     The first addendum, dated March 30, 2015, increased the maximum credit available under the Loan Agreement from $250,000 to $500,000.  A true and correct copy of the first addendum and accompanying Revised Revolving Loan Note are attached hereto as Exhibit F.

70.     The second addendum, dated June 15, 2015, increased the maximum credit available under the Loan Agreement from $500,000 to $750,000.  A true and correct copy of the second addendum and accompanying Revised Revolving Loan Note are attached hereto as Exhibit G.

71.     The third addendum, dated July 22, 2015, increased the maximum credit available under the Loan Agreement from $750,000 to $1,000,000.  A true and correct copy of the third addendum and accompanying Revised Revolving Loan Note are attached hereto as Exhibit H.

72.     The fourth addendum (titled "Third(a)"), dated August 26, 2015, increased the maximum credit available under the Loan Agreement from $1,000,000 to $1,250,000.  A true and correct copy of addendum Third(a) and the accompanying Revised Revolving Loan Note are attached hereto as Exhibit I.

73.     The fifth addendum, dated November 10, 2015, increased the maximum credit available under the Loan Agreement from $1,250,000  to $7,500,000.00.  A true and correct copy of the fifth addendum and the accompanying Revised Revolving Loan Note are attached hereto as Exhibit D.

74.     In each addendum, Shoreside Loans agreed and acknowledged that its obligations under the Guaranty Agreement would be expanded consistent with the increase to the maximum credit.

**PAIF PERFECTS ITS SECURITY INTEREST IN THE COLLATERAL**

75.     PAIF retained Corporation Service Company ("CSC"), as its representative, to file UCC Financing Statements and perfect PAIF's security interest in the Loan Agreement Collateral and the Guaranty Collateral.

76.   On May 4, 2016, CSC filed UCC Financing Statement 16-7523643794 with the Secretary of the State of California, perfecting PAIF's security interest in the Loan Agreement Collateral in the possession of Shoreside SPV Funding I, LLC, with respect to all third parties.  A true and accurate copy of UCC-1 Financing Statement # 16-7523643794 is attached as <u>Exhibit J</u>.

77.   That same day, CSC filed UCC Financing Statements 16-7523643673 (amended May 19, 2016) and 16-7523644189 with the Secretary of the State of California, perfecting PAIF's security interest in the Guaranty Collateral with respect to all third parties.  True and accurate copies of UCC Financing Statements 16-7523643673 (with amendment), and 16-7523644189 are attached collectively as <u>Exhibit K</u>.

<b><u>PAIF'S FUNDING</u></b>

78.   Between March 2015 and May 11, 2016, PAIF provided Shoreside I the credit facility contemplated by the Loan and Security Agreement and Addendums and the Revolving Loan Note.

<b>COHEN AND THE OLD SHORESIDE DEFENDANTS<br>DIVERT PAIF'S COLLATERAL</b>

<b>The Old Shoreside Defendants Divert Collateral for Personal Use</b>

79.   In or around November 2015, PAIF began noticing deficiencies in financial statements that Shoreside Loans provided.

80.   The financial disclosures, which were prepared by Shoreside Loan's then CFO Nicholas R. Bottini, were drastically different than those previously provided and contained knowingly false and misleading information about the loan portfolio and the Eligible Receivables.

81.   For example, PAIF noticed that the balance sheet showed that company assets were being used in violation of Sections 9.7 and 9.12 of the Loan Agreement to pay for personal expenses for Defendants Richard Cohen, Dylan Cohen, Nancy Cohen and Kathy Cohen.

82.     Additionally, PAIF noticed that Richard Cohen, Dylan Cohen, Nancy Cohen and Kathy Cohen were receiving unreasonable and excessive compensation in violation of § 9.12 of the Loan Agreement.

83.     PAIF also discovered that the monthly financial disclosures were inaccurate.  In violation of Section 2.2 of the Loan Agreement, loans were intentionally listed as Eligible Receivables that were more than two payments past due in order to increase the Borrowing Base and avoid having to pay PAIF the deficiency required by Section 2.2.

84.     While issues with the financial disclosures were being uncovered, in or about April 2016, PAIF discovered that Shoreside Loans terminated all its employees and ceased originating new loans through Shoreside I for the loan portfolio that PAIF was funding.

85.     PAIF discovered that all the employees were then hired by Shoreside Capital and were originating new loans for this entity.  Shoreside Capital employees began working on the Shoreside I portfolio.

86.     At the same time Shoreside Loans was terminating its employees, it stopped providing PAIF with monthly financial disclosures in order to hide the improper conduct.

87.     Upon information and belief, Shoreside I's systems, documents, records and personal property (including intellectual property, phone numbers, payment processing accounts, and ACH Accounts) were transferred to Shoreside Capital and/or are being utilized by Shoreside Capital in violation of Sections 9.7 and 9.12 of the Loan Agreement.

88.     After discovering that the principals of Shoreside Loans terminated their employees, PAIF further discovered that Shoreside Loans was transferring its assets to Shoreside Capital for use by Shoreside Capital and in order to avoid obligations owed to PAIF without receiving any reasonably equivalent value in return.

Verified Complaint

89.     In violation of Paragraph 20 of the Guaranty Agreement, since May 1, 2016, Shoreside Loans transferred to Shoreside Capital funds totaling at least one hundred fifty-four thousand, three hundred eighty and 82/100 dollars ($154,380.82).

90.     Upon information and belief, the transferred funds were utilized to fund Shoreside Capital's operations.

91.     Similarly, in April 2016, PAIF discovered that Shoreside Loans discontinued its operations, only to subsequently continue those operations under a new name, Shoreside Capital and that Shoreside Capital was utilizing Shoreside Loans and Shoreside I's ACH account and payment processing account in the new operation.

92.     On information and belief, Shoreside I discontinued its operations, only to subsequently continue those operations under a new name, Shoreside II and, on information and belief, Shoreside Capital and/or Shoreside II was utilizing Shoreside I's assets and its employees.

93.     Shoreside Loans further transferred the servicing rights to the consumer loans in Shoreside I's portfolio to Shoreside Capital without receiving reasonably equivalent value in return and in violation of Section 9.17 of the Loan Agreement.

94.     Upon information and belief, Shoreside I and Shoreside Loans took the actions of discontinuing their operations and transferring assets and rights in order to avoid their obligations to PAIF.

95.     Upon information and belief, R. Cohen, D. Cohen, FPH, Narang and Barlow converted Shoreside I assets for their own use of the use of the New Shoreside Defendants.

Verified Complaint

**PAIF NOTIFIES THE OLD SHORESIDE DEFENDANTS OF THEIR DEFAULTS**

96.     On or about, May 12, 2016, PAIF notified the Old Shoreside Defendants, that they had breached their contractual duties and their actions constitute an "Event of Default" under Section 10.1 of the Loan Agreement.

97.     On July 28, 2016, pursuant to Section 12.3 of the Loan Agreement, PAIF sent to D. Cohen, as Manager for Shoreside I and Shoreside Loans, a letter demanding payment of all amounts due and owing under the Loan Note (the "Payoff Amount") and noticing Shoreside I and Shoreside Loans of an Event of Default (the "Demand Letter").  A true and correct copy of the Letter is attached as Exhibit L.

98.     The Demand Letter outlined a number of acts constituting the Event of Default and demanded payment from Shoreside I of the Payoff Amount within seven (7) days of the date of the letter.  The Demand Letter put Shoreside Loans on notice and requested from it immediate payment of the Payoff Amount, pursuant to the terms of the Guaranty Agreement.  The Demand Letter also advised Shoreside I and Shoreside Loans that if payment was not made, PAIF would should seek to enforce all of its legal rights and remedies against them.

99.     As of the date of this filing, the Payoff Amount has not been paid.

100.    As a result of the Old Shoreside Defendants' breaches and Event of Default, PAIF has the contractual right to:  take possession of the Loan Agreement Collateral and the Guaranty Collateral; demand repayment of the entire unpaid principal balance of the Revolving Loan Note plus interest; and to recover all its collection costs and expenses (including reasonable attorneys' fee).

101.    As of August 24, 2016, Shoreside I owes $1,828,458.17 in principal and interest on the Revolving Loan Note to PAIF, which is broken down as follow:

Total principal outstanding:     $2,077,736.85

Loan Loss Reserve:               $249,278.68

Verified Complaint

Total principal owed      $1,828,458.17

**COUNT ONE**

**(Breach of Contract/Default under the Loan Agreement**

**and Revolving Loan Note – Shoreside I)**

102.   FRS realleges the allegations in the preceding paragraphs as if set forth at length herein.

103.   PAIF is the holder of the Revolving Loan Note, duly executed by Shoreside I, in the amount of seven million five hundred thousand and 00/100 dollars ($7,500,000.00).

104.   In the Revolving Loan Note, which incorporated the Loan Agreement by reference, Shoreside I agreed that an Event of Default under the Loan Agreement constituted an Event of Default under the Revolving Loan Note.

105.   Shoreside I has triggered Events of Default under the Loan Agreement, and therefore an Event of Default under the Revolving Loan Note by:

- intentionally listing loans as Eligible Receivables that were more than two payments past due in order to increase the Borrowing Base and avoid having to pay PAIF the Deficiency required by Section 2.2;
- failing to provide account and financial disclosures after April 2016;
- using company assets for personal use;
- transferring its assets and rendering itself insolvent;
- replacing Shoreside Loans, a Program Vendor, with Shoreside Capital without PAIF's prior approval;
- directly or indirectly merging into or consolidating with Shoreside II;
- selling, assigning, leasing, transferring or disposing of any of its assets; and

- creating a Material Adverse Change by diverting its assets and moving all its employees to Shoreside Capital and/or Shoreside II, and thereby decreasing the value of Shoreside I's business, operations, assets, and financial condition.

106. In response to Shoreside I's Events of Default, PAIF exercised its contractual right to declare the entire balance due under the Revolving Loan Note immediately payable.

107. Presently, Shoreside I owes PAIF $1,828,458.17 in principal on the Revolving Loan Note, plus accruing interest, default interest, and legal fees and expenses.

108. As assignee of the Revolving Loan Note, FRS is entitled to assert PAIF's rights.

**WHEREFORE**, FRS requests that the Court enter judgment in its favor and against Defendant Shoreside I for:

(1)    compensatory damages;

(2)    attorneys' fees and costs associated with bringing this action; and

(3)    such additional relief that this Court deems just and proper.

## COUNT TWO

### (Breach of the Loan and Security Agreement and Attachment – Shoreside I)

109. FRS realleges the allegations in the preceding paragraphs as if set forth at length herein.

110. As and for security for the obligations evidenced by the Revolving Loan Note, Shoreside I granted PAIF a security interest in, among other things, the Loan Agreement Collateral under the Loan Agreement.

111. Plaintiff's security interest in the Loan Agreement Collateral was perfected though the proper filing of UCC-1 Financing Statement # 16-7523643794 attached as Exhibit J.

Verified Complaint

112.   Through the Loan Agreement and UCC-1 Financing Statement # 16-7523643794, Plaintiff has a valid and perfected security interest in all of Shoreside I's "personal and real property . . . including without limitation . . . all Assignments . . . ; all Receivables and all Collections; all instruments . . . all Accounts . . . ; all Contract Files . . . ; all Pledged Accounts . . . ; all general intangibles . . .including . . . Intellectual Property; all goods, including . . . all Inventory and Equipment; all chattel paper . . . ; all documents; all letters of credit . . . ; all supporting obligations . . . in respect to Receivables . . . ; all investment property . . . ; all commercial tort claims . . . ; all Records; and all insurance proceeds and all claims against third parties for loss to or destruction [of the Loan Agreement Collateral]."

113.   A copy of the most recent list of Aging Summary Report that shows a summary of the consumer loans in which PAIF has a security interest is attached as Exhibit M.

114.   Under the Loan Agreement, Shoreside I agreed, among other things, that upon an Event of Default, PAIF was allowed to "with or without judicial process or the aid or assistance of others, enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or complete processing, manufacturing and repair of all or any portion of the Collateral" or "require [Shoreside I], at [Shoreside I's] expense, to assemble and make available to [PAIF] any part or all of the Collateral at any place and time designated by [PAIF.]"

115.   Shoreside I has defaulted under the terms of the Loan Agreement by, among other things,

- intentionally listing loans as Eligible Receivables that were more than two payments past due in order to increase the Borrowing Base and avoid having to pay PAIF the Deficiency required by Section 2.2;

Verified Complaint

- failing to provide account and financial disclosures after April 2016;

- using company assets for personal use;

- transferring its assets and rendering itself insolvent;

- replacing Shoreside Loans, a Program Vendor, with Shoreside Capital without PAIF's prior approval;

- directly or indirectly merging into or consolidating with Shoreside II;

- selling, assigning, leasing, transferring or disposing of any of its assets; and

- creating a Material Adverse Change by diverting its assets and moving all its employees to Shoreside Capital and/or Shoreside II, and thereby decreasing the value of Shoreside I's business, operations, assets, and financial condition.

116.   In an attempt to hide its diversion, Shoreside I failed to provide accurate daily reports and other reports, concerning Shoreside I's account and financial statements.

117.   As an assignee of PAIF's rights, FRS is entitled to maintain an action to recover the Loan Agreement Collateral because it has a secured interest in that Collateral and it is otherwise entitled to immediate possession of it under the express terms of the Loan Agreement.

118.   As a result of Shoreside I's default and the Loan Agreement and Revolving Loan Note, FRS is entitled to immediate possession of the Loan Agreement Collateral and all collections upon and records concerning the Loan Agreement Collateral, which includes all accounts (including debit card and credit card processing), equipment, inventory, general intangibles and the proceeds of the sale of inventory.

Verified Complaint

119.   FRS has been damaged and continues to be damaged by Shoreside I's breach of the Loan Agreement.

**WHEREFORE**, FRS demands judgment against Shoreside I:

(1)   issuing a Writ of Attachment that commands the United States Marshal for the Central District of California, Los Angeles Sheriff, or other competent authority, to take possession, custody and control of all Loan Agreement Collateral (including ACH Accounts and Payment Processing Accounts) until such time as the dispute between the parties has been resolved and, if resolved in FRS's favor, to deliver such collateral to FRS;

(2)   ordering Shoreside I and its agents, officers and employees to cooperate fully with FRS and its representatives and agents, together with the law enforcement authorities to facilitate the orderly attachment of the Loan Agreement Collateral;

(3)   ordering compensatory damages due and owing under the Revolving Loan Note in an amount of not less than $1,828,458.17, plus accruing interest, default interest, legal fees and expenses and all other amounts due and owing under the Revolving Loan Note;

(4)   ordering that any judgment entered against Shoreside I includes an amount sufficient to compensate FRS for its reasonable costs of repossession and suit, including attorneys' fees; and

(5)   ordering such additional relief that this Court deems just and proper.

**COUNT THREE**

**(Declaratory Judgment and Injunction Against**

**Diminishment of the Loan Agreement Collateral – Shoreside I)**

120.   FRS realleges the allegations in the preceding paragraphs as if set forth at length herein.

Verified Complaint

121.   As and for security for the obligations evidenced by the Revolving Loan Note, Shoreside I granted PAIF a security interest in, among other things, the Loan Agreement Collateral under the Loan Agreement.

122.   Plaintiff's security interest in the Loan Agreement Collateral was perfected though the proper filing of UCC-1 Financing Statement # 16-7523643794 attached as Exhibit J.

123.   Through the Loan Agreement and UCC-1 Financing Statement # 16-7523643794, Plaintiff has a valid and perfected security interest in all of Shoreside I's "personal and real property . . . including without limitation . . . all Assignments . . . ; all Receivables and all Collections; all instruments . . . all Accounts . . . ; all Contract Files . . . ; all Pledged Accounts . . . ; all general intangibles . . . including . . . Intellectual Property; all goods, including . . . all Inventory and Equipment; all chattel paper . . . ; all documents; all letters of credit . . . ; all supporting obligations . . . in respect to Receivables . . . ; all investment property . . . ; all commercial tort claims . . . ; all Records; and all insurance proceeds and all claims against third parties for loss to or destruction [of the Loan Agreement Collateral]."

124.   A copy of the most recent list of Aging Summary Report that shows a summary of the consumer loans in which PAIF has a security interest is attached as Exhibit M.

125.   Under the Loan Agreement, Shoreside I agreed, among other things, that upon an Event of Default, PAIF was allowed to "with or without judicial process or the aid or assistance of others, enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or complete processing, manufacturing and repair of all or any portion of the Collateral" or "require [Shoreside I], at [Shoreside I's] expense, to assemble and make available to [PAIF] any part or all of the Collateral at any place and time designated by [PAIF.]"

Verified Complaint

126.   Shoreside I has defaulted under the terms of the Loan Agreement by, among other things,

- intentionally listing loans as Eligible Receivables that were more than two payments past due in order to increase the Borrowing Base and avoid having to pay PAIF the Deficiency required by Section 2.2;

- failing to provide account and financial disclosures after April 2016;

- using company assets for personal use;

- transferring its assets and rendering itself insolvent;

- replacing Shoreside Loans, a Program Vendor, with Shoreside Capital without PAIF's prior approval;

- directly or indirectly merging into or consolidating with Shoreside II;

- selling, assigning, leasing, transferring or disposing of any of its assets; and

- creating a Material Adverse Change by diverting its assets and moving all its employees to Shoreside Capital and/or Shoreside II, and thereby decreasing the value of Shoreside I's business, operations, assets, and financial condition.

127.   In an attempt to hide its diversion, Shoreside I failed to provide accurate daily reports and other reports, concerning Shoreside I's account and financial statements.

128.   PAIF is entitled to maintain an action to recover the Loan Agreement Collateral because it has a secured interest in that Collateral and it is otherwise entitled to immediate possession of it under the express terms of the Loan Agreement.

Verified Complaint

129.   As a result of Shoreside I's default and the Loan Agreement and Revolving Loan Note, PAIF is entitled to immediate possession of the Loan Agreement Collateral and all collections upon and records concerning the Loan Agreement Collateral, which includes all accounts, equipment, inventory, general intangibles and the proceeds of the sale of inventory.

130.   As assignee of PAIF's rights, FRS has suffered and continues to suffer irreparable harm by being denied access to the Loan Agreement Collateral securing the Revolving Loan Note.

**WHEREFORE**, FRS demands judgment against Shoreside I:

(1)     enjoining Shoreside I, its agents, officers and employees from expending, transferring, selling, destroying or secreting all or any portion of the Loan Agreement Collateral including all of Shoreside I's accounts, equipment, inventory, general intangibles and the proceeds of the sale of the inventory;

(2)     declaring that FRS is entitled to exclusive possession of the Loan Agreement Collateral, including but not limited to, all of Shoreside I's accounts, equipment, inventory, general intangibles and the proceeds of the sale of inventory;

(3)     attorneys' fees and costs associated with bringing this action; and

(4)     ordering such other and further relief as it deems just and necessary under the circumstances.

## COUNT FOUR

### (Breach of Contract – Guarantee – Shoreside Loans)

131.   FRS realleges the allegations in the preceding paragraphs as if set forth at length herein.

132.   The Guaranty Agreement executed by Shoreside Loans is a valid and binding contract between Shoreside Loans and PAIF.

133.   PAIF's rights under the Guaranty Agreement have been assigned to FRS.

Verified Complaint

134.   Shoreside Loans has breached the express terms of the Guaranty Agreement by failing and refusing to pay all sums now due and owing by Shoreside I upon Shoreside I's default of the Loan Agreement, and as required by the express terms of the Guaranty Agreement.

135.   Shoreside Loans also breached the Guaranty Agreement by diverting the Guaranty Collateral and all its assets to Shoreside Capital.

136.   As a direct result of Shoreside Loans breach of the Guaranty Agreement and as PAIF's assignee, FRS has suffered, and continues to suffer, damages in the amount of at least $1,828,458.17, plus accruing interest, default interest, legal fees and expenses and all other amounts due and owing under the Revolving Loan Note.

**WHEREFORE**, FRS requests that the Court enter judgment in its favor and against Defendant Shoreside Loans for:

(1)   compensatory damages;

(2)   attorneys' fees and costs associated with bringing this action; and

(3)   such additional relief that this Court deems just and proper.

## COUNT FIVE

**(Breach of the Guaranty and Suretyship Agreement and Attachment – Shoreside Loans)**

137.   FRS realleges the allegations in the preceding paragraphs as if set forth at length herein.

138.   As and for security for the obligations evidenced by the Revolving Loan Note, Shoreside Loans granted PAIF security interests in, among other things, the Guaranty Collateral under the Guaranty Agreement.

139.   PAIF's security interest in the Collateral was perfected though the proper filing of UCC-1 Financing Statements # 16-7523643673, # 16-7523644189 and UCC-1 Financing Statement # 16-75263460 collectively attached as Exhibit K.

140.   Through the Guaranty Agreement and these Financing Statements, PAIF has a valid and perfected security interest in the following:

> All rights, title and interest of [Shoreside Loans] in and to all consumer loans, whether now owned or hereafter arising or acquired, assigned and transferred by [Shoreside Loans] to [Shoreside I], together with all related promissory notes, all rights to loan files and other records, and all rights of [Shoreside Loans] to agreements therein and to receive from any third party or to take delivery of any documents which constitute a part of the loan file and the proceeds of any and all of the foregoing loan files and all rights and obligations arising under the documents contained therein.  Together with any and all other consumer loans, receivables, accounts, contracts, instruments, general intangibles and payment intangibles, whether now owned or hereafter arising or acquired, included in the conveyed assets described in an assignment and conveyance agreement between [Shoreside Loans] and [Shoreside I], or such similar document or agreement of transfer, as such assignment and conveyance agreement or such similar document or agreement of transfer may be supplemented or amended from time to time.

141.   Under the Guaranty Agreement, Shoreside Loans agreed, among other things, that upon an Event of Default by Shoreside I, PAIF "shall be immediately entitled . . . to enforce the obligations of [Shoreside Loans] under the Guaranty Agreement.

142.   Shoreside I has committed an Event of Default as further articulated in Counts One and Two of the Complaint.

143.   Additionally, Shoreside Loans has defaulted under the terms of the Guaranty Agreement by, among other things, diverting the Guaranty Collateral and all its assets to Shoreside Capital.

144.   As assignee of PAIF's rights, FRS is entitled to maintain an action to recover the Guaranty Collateral because they have a secured interest in the

Guaranty Collateral and they are otherwise entitled to immediate possession of it under the express terms of the Guaranty Agreement.

145.   As a result of Shoreside Loan's default and the Guaranty Agreement, FRS is entitled to immediate possession of the Guaranty Collateral and all collections upon and records concerning the Guaranty Collateral, which includes all consumer loans, receivables, accounts, contracts, instruments, general intangibles and payment intangibles.

146.   FRS has been damaged and continues to be damaged by Shoreside Loan's breach of the Loan Agreement.

**WHEREFORE**, FRS demands judgment against Shoreside Loans:

(1)   issuing a Writ of Attachment that commands the United States Marshall for the Central District of California, Los Angeles Sheriff, or other competent authority, to take possession, custody and control of all collateral outlined in the Guaranty Agreement referenced in the Complaint (including ACH Accounts and Payment Processing Accounts) until such time as the dispute between the parties has been resolved and, if resolved in FRS's favor, to deliver such collateral to FRS;

(2)   ordering Shoreside Loans and its agents, officers and employees cooperate fully with FRS and its representatives and agents, together with the law enforcement authorities to facilitate the orderly attachment of the Guaranty Collateral; and

(3)   ordering compensatory damages due and owing under the Revolving Loan Note in an amount of not less than $1,828,458.17, plus accruing interest, default interest, legal fees and expenses and all other amounts due and owing under the Revolving Loan Note;

(4)   ordering that any judgment entered against Shoreside Loans includes an amount sufficient to compensate FRS for its reasonable costs of repossession and suit, including attorneys' fees; and

Verified Complaint

(5)     ordering such additional relief that this Court deems just and proper.

## COUNT SIX

### (Declaratory Judgment and Injunction Against

### Diminishment of the Guaranty Collateral – Shoreside Loans)

147.   FRS realleges the allegations in the preceding paragraphs as if set forth at length herein.

148.   As and for security for the obligations evidence by the Revolving Loan Note, Shoreside Loans granted PAIF security interests in, among other things, the Guaranty Collateral under the Guaranty Agreement.

149.   PAIF's security interest in the Collateral was perfected though the proper filing of UCC-1 Financing Statements # 16-7523643673, # 16-7523644189 and UCC-1 Financing Statement # 16-75263460 collectively attached as Exhibit K.

150.   The Guaranty Agreement and Financing Statements were assigned to FRS.

151.   Through the Guaranty Agreement and these Financing Statements, FRS has a valid and perfected security interest in the following:

> All rights, title and interest of [Shoreside Loans] in and to all consumer loans, whether now owned or hereafter arising or acquired, assigned and transferred by [Shoreside Loans] to [Shoreside I], together with all related promissory notes, all rights to loan files and other records, and all rights of [Shoreside Loans] to agreements therein and to receive from any third party or to take delivery of any documents which constitute a part of the loan file and the proceeds of any and all of the foregoing loan files and all rights and obligations arising under the documents contained therein.  Together with any and all other consumer loans, receivables, accounts, contracts, instruments, general intangibles and payment intangibles, whether now owned or hereafter arising or acquired, included in the conveyed assets described in an assignment and conveyance agreement between [Shoreside Loans] and [Shoreside I], or such similar document or agreement of transfer, as such assignment

-33-

Verified Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and conveyance agreement or such similar document or agreement of transfer may be supplemented or amended from time to time.

152.  Under the Guaranty Agreement, Shoreside Loans agreed, among other things, that upon an Event of Default by Shoreside I, PAIF "shall be immediately entitled . . . to enforce the obligations of [Shoreside Loans] under the Guaranty Agreement.

153.  Shoreside I has committed an Event of Default as further articulated in Counts One and Two of the Complaint.

154.  Additionally, Shoreside Loans has defaulted under the terms of the Guaranty Agreement by, among other things, diverting the Guaranty Collateral and all its assets to Shoreside Capital.

155.  As assignee of PAIF's rights, FRS is entitled to maintain an action to recover the Guaranty Collateral because, as assignee of PAIF's rights, it has a secured interest in the Guaranty Collateral and is otherwise entitled to immediate possession of it under the express terms of the Guaranty Agreement.

156.  As a result of Shoreside Loan's default and the Guaranty Agreement, FRS is entitled to immediate possession of the Guaranty Collateral and all collections upon and records concerning the Guaranty Collateral, which includes all consumer loans, receivables, accounts, contracts, instruments, general intangibles and payment intangibles.

157.  FRS has suffered and continues to suffer irreparable harm by being denied access to the Guaranty Collateral securing the Revolving Loan Note.

**WHEREFORE**, FRS demands judgment against Shoreside Loans:

(1)  enjoining Shoreside Loans, its agents, officers and employees from expending, transferring, selling, destroying or secreting all or any portion of the Guaranty Collateral including all of Shoreside Loans' consumer loans, receivables, accounts, contracts, instruments, general intangibles and payment intangibles;

Verified Complaint

(2)     declaring that FRS is entitled to exclusive possession of the Guaranty Collateral, including but not limited to, all of Shoreside Loans' consumer loans, receivables, accounts, contracts, instruments, general intangibles and payment intangibles; and

(3)     attorneys' fees and costs associated with bringing this action; and

(4)     ordering such other and further relief as it deems just and necessary under the circumstances.

## COUNT SEVEN

### (Breach of Fiduciary Duty –Dylan Cohen)

158.   FRS realleges the allegations in the preceding paragraphs as if set forth at length herein.

159.   Under New Jersey law, an officer or director of an insolvent corporation stands in a fiduciary relationship with and owes a fiduciary duty to the corporation's creditors.

160.   When the Old Shoreside Defendants became insolvent, *i.e.*, unable to make timely payments to its creditors in or around March 2016, D. Cohen, in his capacity as Manager Member of the Old Shoreside Defendants owed a fiduciary duty to the creditors of the Old Shoreside Defendants, including PAIF.

161.   This fiduciary duty included the duty to preserve the Collateral serving as security for the loans that PAIF made to the Old Shoreside Defendants.

162.   D. Cohen breached his fiduciary duty to PAIF (and FRS) by transferring certain Old Shoreside Defendants' assets to the New Shoreside Defendants, without receiving a reasonably equivalent value in exchange and/or with intent to defraud and hinder PAIF (and FRS) in the exercise of rights as a creditor.

163.   D. Cohen's breach of fiduciary duty to FRS is causing and continues to cause damage to FRS.

Verified Complaint

1   **WHEREFORE**, FRS demands judgment in its favor and Cohen for the

2   following:

3       (1)    compensatory damages;

4       (2)    attorneys' fees, costs and interest; and

5       (3)    ordering such other and further relief as it deems just and necessary

6   under the circumstances.

7                               **COUNT EIGHT**

8   **(Alter Ego/Pierce Corporate Veil – New Shoreside Defendants and the Cohens)**

9       164.   FRS realleges the allegations in the preceding paragraphs as if set forth

10  at length herein.

11      165.   In order to avoid obligations it owes to its creditors, the Old Shoreside

12  Defendants and the Cohens conspired with FPH to establish the New Shoreside

13  Defendants.

14      166.   The Old Shoreside Defendants, the Cohens and FPH established the

15  New Shoreside Defendants in March 2016, around the time PAIF began seeing

16  deficiencies in the Old Shoreside Defendants' financial statements.

17      167.   The New Shoreside Defendants are mere alter egos and/or

18  instrumentalities of the Old Shoreside Defendants and their principals, the Cohens.

19      168.   The Cohens are exercising control over the New Shoreside Defendants

20  in such a way as to defraud and harm PAIF and FRS as PAIF's assignee.

21      169.   Upon information and belief, the New Shoreside Defendants have

22  many of the employees, equipment, systems and accounts in their operations that

23  were being used by the Old Shoreside Defendants.

24      170.   There is such a unity of interest of ownership between the Old

25  Shoreside Defendants and the New Shoreside Defendants that their separateness

26  has ceased.

27

28

Verified Complaint

171. Respecting the New Shoreside Defendants' separate corporate existence from that of the Old Shoreside Defendants would sanction a fraud, promote injustice or subject FRS to an unjust loss.

172. As a result of the lack of separate existence between the Old Shoreside Defendants and the New Shoreside Defendants and Cohens, the Court should pierce the corporate veil and hold the New Shoreside Defendants responsible for the Old Shoreside Defendants' obligations to FRS.

**WHEREFORE**, FRS demands judgment in its favor and against the New Shoreside Defendants and the Cohens for the following:

(1)    compensatory damages;

(2)    attorneys' fees, costs and interest; and

(3)    ordering such other and further relief as it deems just and necessary under the circumstances.

**COUNT NINE**

**(Fraudulent Conveyance – All Defendants)**

173. FRS realleges the allegations in the preceding paragraphs as if set forth at length herein.

174. Under Section 25:2-27 of the New Jersey Fraudulent Transfer Act, a transfer is "fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

175. Section 25:2-26 provides that in determining "actual intent to hinder, delay or defraud", the relevant factors include whether: (i) the transfer was to an insider; (ii) the transfer was not for reasonably equivalent value; (iii) the debtor was insolvent before the transfer, or became insolvent shortly after the transfer, with

insolvency presumed from the inability to pay one's bills when due; and (iv) the transfer was concealed.

176.   During March 2016, the Old Shoreside Defendants together with the Individual Defendants and FPH engaged in a scheme to transfer the assets that comprise the Collateral of PAIF to the New Shoreside Defendants.

177.   This transfer of assets included, but is not limited to, the transfer of Old Shoreside Defendants' funds totaling no less than one hundred fifty-four thousand, three hundred eighty and 82/100 dollars ($154,380.82)

178.   The Old Shoreside Defendants and the Individual Defendants made these transfers at a time when the Old Shoreside Defendants were not otherwise able to fulfill their payment obligations to PAIF (or FRS).

179.   The Old Shoreside Defendants and the Individual Defendants made these transfers without receiving a reasonably equivalent value in exchange for the assets that were transferred.

180.   The New Shoreside Defendants are effectively controlled by the Individual Defendants and FPH and are being used to carry on the business of the Old Shoreside Defendants while at the same time avoid the Old Shoreside Defendants' obligations to FRS and other creditors.

181.   At the time the Old Shoreside Defendants and the Individual Defendants transferred the assets that comprise the Collateral of PAIF (FRS), the Old Shoreside Defendants were in default of their loan obligations to PAIF (FRS).

182.   The Old Shoreside Defendants and the Individual Defendants sought to conceal the transfers by failing and refusing to provide information about them to PAIF, even though they were obligated to do so under the loan documents they signed.

183.   PAIF was a creditor of the Old Shoreside Defendants both before and after the transfers of the Old Shoreside Defendants' assets.

184.   FRS is an assignee of PAIF's rights.

Verified Complaint

185.   The transfers of the Old Shoreside Defendants' assets to the New Shoreside Defendants were made with the intent to hinder and defraud PAIF (and FRS).

186.   In participating in the transfers of the Old Shoreside Defendants' assets, the New Shoreside Defendants, the Individual Defendants and FPH did not act in good faith.

187.   FRS has been harmed as a result of the Old Shoreside Defendants' transfer of Collateral to the New Shoreside Defendants.

188.   All the specific information about the transfers of assets from the Old Shoreside Defendants to the New Shoreside Defendants as well as other improper transfers of the Shoreside Defendants' assets, is within the exclusive control of the Shoreside Defendants, the Individual Defendants and FPH.

**WHEREFORE**, FRS demands:

(1)   A judgment be entered in FRS's favor and against the New Shoreside Defendants in the amount equal to the lesser of (i) the value of the assets transferred from the Old Shoreside Defendants to the New Shoreside Defendants, or (ii) the amount of the judgment FRS obtains against the Old Shoreside Defendants;

(2)   The Court issue an injunction prohibiting the Old Shoreside Defendants, and their agents, officers and employees from transferring, selling, expending, destroying or secreting all or any portion of the Collateral and Guaranty Collateral;

(3)   The Court issue an injunction prohibiting the New Shoreside Defendants, the Individual Defendants and FPH and/or their agents, officers and employees from transferring, selling, expending, destroying or secreting all or any portion of the Collateral and Guaranty Collateral;

(4)   The Court impose a constructive trust in favor of FRS on the New Shoreside Defendants in the amount equal to the value of assets wrongfully transferred to the New Shoreside Defendants by the Old Shoreside Defendants;

Verified Complaint

(5)     The Court issue a Writ of Attachment that commands the United States Marshall for the Central District of California, Los Angeles Sheriff, or other competent authority, to take possession, custody and control of all collateral outlined in the Loan Agreement and Guaranty Agreement referenced in the Complaint that is in the possession of the New Shoreside Defendants until such time as the dispute between the parties has been resolved and, if resolved in FRS's favor, to deliver such collateral to FRS;

(6)     The Court appoint a receiver for the Old Shoreside Defendants; and

(7)     The Court grant such other relief as it deems just.

## COUNT TEN

**(Civil Conspiracy – Defendants Old Shoreside Defendants, New Shoreside Defendants, FPH, Narang, Barlow, R. Cohen, and D. Cohen)**

189.   FRS realleges the allegations in the preceding paragraphs as if set forth at length herein.

190.   The New Shoreside Defendants, FPH, Narang and Barlow entered into an agreement, combination, understanding or scheme with the Old Shoreside Defendants, D. Cohen and R. Cohn with the intent of defrauding PAIF (and FRS) of the value of the Loan Agreement Collateral and Guaranty Collateral.

191.   Each Defendant knowingly, voluntarily and intentionally participated as a member of the conspiracy to defraud PAIF (and FRS) of the value of the Loan Agreement Collateral and Guaranty Collateral.

192.   For example, Defendants New Shoreside Defendants, FPH, Narang, Barlow, R. Cohen, and D. Cohen agreed to provide PAIF with false financial disclosures and then, after April 2016 ceased providing financial disclosures altogether to mask the fact that the Old Shoreside Defendants were closing down their operations and ceasing to function as operating entities.

193.   In addition and upon information and belief, Defendants New Shoreside Defendants, FPH, Narang, Barlow, R. Cohen, and D. Cohen have

Verified Complaint

converted certain of the Old Shoreside Defendants' funds, records, accounts (including ACH and Payment Processing Accounts), phone numbers, business processes and Intellectual Property for use in the New Shoreside Defendants' operations.

194.   Defendants New Shoreside Defendants, FPH, Narang, Barlow, R. Cohen, and D. Cohen specifically intended that the conspiracy would defraud PAIF (and FRS) of the value of the Collateral and Guaranty Collateral.

195.   As a direct and proximate result of Defendants wrongful acts as alleged above, PAIF has suffered damages and injury based on the fact that funds, Intellectual Property, accounts, and employees utilized in the Old Shoreside Defendants' operations were wrongfully transferred to the New Shoreside Defendants, and the Old Shoreside Defendants have ceased generating new loans or paying off the "Deficiency" created by bad loans in the loan portfolio.

196.   Indeed, Shoreside I and Shoreside Loans went from fully operational loan originator with value to entities that have ceased operations and turned over much of their general intangible assets for use by the New Shoreside Defendants.

**WHEREFORE**, FRS demands judgment in its favor and against Defendants Old Shoreside Defendants, New Shoreside Defendants, FPH, Narang, Barlow, R. Cohen, and D. Cohen for the following:

(1)   compensatory damages;

(2)   attorneys' fees, costs and interest; and

(3)   ordering such other and further relief as it deems just and necessary under the circumstances.

## COUNT ELEVEN

**(Conversion – New Shoreside Defendants, the Cohens, Narang, Barlow, John or Jane Does 1 through 10 and ABC Corporations 1 through 10)**

197.   FRS realleges the allegations in the preceding paragraphs as if set forth at length herein.

-41-

Verified Complaint

198.   As described above, the New Shoreside Defendants and the Cohens are in wrongful possession of assets of the Old Shoreside Defendants which serve as FRS's collateral (the "Funds") and they are exercising unlawful and improper control and custody over the Funds.

199.   These Funds include money expended by the Cohens for personal use, including the purchase of luxury automobiles and money paid for unreasonable compensation.

200.   Upon information and belief, these Funds also include money in the unlawful and improper control and custody of the New Shoreside Defendants, FPH, Narang and Barlow that should be utilized in the Old Shoreside Defendants operations.

201.   By maintaining wrongful possession of the Funds, the New Shoreside Defendants, the Cohens, FPH, and/or Narang and Barlow have willfully and intentionally interfered with PAIF's (or FRS's ) interest in the Funds, without PAIF's (or FRS's ) consent and without lawful justification.

202.   PAIF had, and continues to have, an immediate right to possession of the Funds at the time they were converted.

203.   FRS is an assignee of PAIF's rights with regard to the Funds.

204.   PAIF has demanded a return of the Funds, but the New Shoreside Defendants, the Cohens, FPH, and/or Narang and Barlow have failed and refused to return the Funds and have converted the Funds for their own use and enjoyment.

205.   As a result, FRS has been damaged by being deprived of the possession, control, and enjoyment of Funds that serve as its collateral.

**WHEREFORE**, FRS demands judgment in its favor and against the New Shoreside Defendants, the Cohens, Narang and Barlow for the following:

(1)   compensatory damages;

(2)   attorneys' fees, costs and interest; and

Verified Complaint

(3)     ordering such other and further relief as it deems just and necessary under the circumstances.

### COUNT TWELVE

**(Aiding and Abetting – New Shoreside Defendants, R. Cohen, Narang, Barlow, John or Jane Does 1 through 10 and ABC Corporations 1 through 10)**

206.   FRS realleges the allegations in the preceding paragraphs as if set forth at length herein.

207.   The New Shoreside Defendants, D. Cohen, R. Cohen, FPH, Narang and Barlow knew or should have known that the Old Shoreside Defendants owed duties and obligations to PAIF with regard to the credit facility that PAIF provided to the Old Shoreside Defendants.

208.   The New Shoreside Defendants, R. Cohen, FPH, Narang and Barlow knew or should have known that D. Cohen owed a fiduciary duty to PAIF that required him to preserve the value of the Collateral serving as security for the loans that PAIF made to the Old Shoreside Defendants.

209.   The New Shoreside Defendants, R. Cohen, D. Cohen, FPH, Narang and Barlow aided and abetted the Old Shoreside Defendants breach obligations they owed to PAIF by engaging in conduct that assisted in the torts alleged herein, including the fraudulent conveyances and conversion that occurred.

210.   Specifically, the New Shoreside Defendants, R. Cohen, D. Cohen, FPH, Narang and Barlow assisted in moving assets and employees, transferring funds and preventing disclosure of accurate financial information to PAIF.

211.   The New Shoreside Defendants, R. Cohen, FPH, Narang and Barlow aided and abetted D. Cohen breach fiduciary obligations he owed to PAIF by moving assets and employees, transferring funds and preventing disclosure of accurate financial information to PAIF.

Verified Complaint

212.   As a result of the conduct of the New Shoreside Defendants, R. Cohen, D. Cohen, FPH, Narang and Barlow, FRS, as assignee of PAIF's rights, has suffered and continues to suffer damages.

**WHEREFORE**, FRS demands judgment in its favor and against the New Shoreside Defendants, R. Cohen, D. Cohen, FPH, Narang and Barlow for the following:

(1)     compensatory damages;

(2)     attorneys' fees, costs and interest; and

(3)     ordering such other and further relief as it deems just and necessary under the circumstances.

**DATED**:  September 15, 2016      **PEPPER HAMILTON LLP**

By:_____

Jeffrey M. Goldman, Esq.

*Attorneys for Plaintiff*
*Fund Recovery Services, LLC*

Verified Complaint

1

2                          **<u>VERIFICATION</u>**

3          I, Jack Cook, of full age, hereby verify as follows:

4

5                  1.      I am the Chief Operating Officer for Plaintiff Fund Recovery

6   Services, LLC and of Princeton Alternative Income Fund, LP and I have personal

7   knowledge of the facts set forth in this Verified Complaint.

8

9                  2.      I have read the facts set forth in the fact section of the Verified

10  Complaint and certify that all facts not based on information and belief are true to

11  the best of my knowledge and belief.

12

13                 3.      I also have reviewed the exhibits attached to the Verified

14  Complaint and certify that they are true and accurate copies of documents that PAIF

15  obtained from or sent to the Old Shoreside Defendants.

16

17                 4.      I understand that if said facts are willfully false, I am subject to

18  punishment.

19

20

21

22  Dated: September 14, 2016

                                           Jack Cook

23

24

25

26

27

28

                                            -45-
                                         Verification